THE LEHIGH ZINC AND IRON COMPANY (LIMITED), appellants,

*v.*

CHARLES W. TROTTER, respondent.

Trotter was under a contract to deliver to a company in Pennsylvania certain quantities of ore each month, and receive monthly payments. A suit having arisen, the court of chancery, during its pendency, by consent of the parties, placed a manager in charge of the business to deliver ore and receive payments. A writ of attachment was issued in Pennsylvania by a creditor of Trotter, and the money due for ore was attached in the hands of the company, who thereupon refrained from making a monthly payment, on account of which the manager stopped shipments for three months.—*Held*, that a decree ordering that the company should, after the expiration of this time, receive, in addition to their regular monthly quotas, parts of the ore which had been detained by the manager, is erroneous.

Appeal from an order advised by Vice-Chancellor Bird, who filed the following conclusions:

These parties were in dispute over the working of a mine. In May, 1882, this bill was filed. In August, 1882, the court made an order appointing a manager. He had power to take samples for assays and to direct the operations of the workmen generally. All the rest is left to Charles W. Trotter under his agreement. Trotter employs all the men and pays them; he furnishes all the tools and machinery.

While the mine was being so managed, Charles A. Heckscher, one of the defendants, procured a writ of attachment out of the supreme court against Charles W. Trotter, and had it served, by attaching all the tools, machinery &c. used in said mining business. Trotter comes in by petition setting up the facts, and declares that the service of said writ on those goods (although the officer did not take possession of them) was in violation of the order of the court appointing a manager, and in contempt of said order. It is said that this arises from the facts that Heckscher

Lehigh Zinc and Iron Co. *v.* Trotter.

is a defendant in the suit, not only as a member of the company, but also individually, and is thereby bound to obey all the orders of the court, and bound not to interfere with the fair execution of any of them, and that the manager is an officer of this court and acting under its directions.

I cannot conclude that the petitioner is right on this branch of the case. Supposing that the manager be regarded as a receiver, and clothed with like powers and duties, it would be questionable whether the mere service of a writ of attachment, at the instance of one of the parties to the suit in which such receiver should be appointed, without taking possession of the things attached, would be in contempt of the order appointing a receiver. It is most clear that while this court should strive to maintain proper respect for its 'orders and decrees, it would be very slow to prevent any citizen from exercising any or all of his legal rights or remedies. This consideration comes up before me with great force. It seems to me that it would be quite severe indeed for this court to say it was contempt for a party to a suit to have an attachment levied upon goods in the hands of a receiver, without more; the attachment not being issued against the receiver, and in no sense controlling or interfering with him or with his rights or possession as such. I think the court would not be justified in so limiting or controlling the rights of creditors. Such limitation might, in many cases, defeat the claims of the diligent.

But in this case there is no receiver; only a manager or superintendent, clothed with no other authority; no right to sue or to collect moneys, or to transfer title to property. His management is not interfered with by the service of the attachment. There is no pretence of any hindrance or delay.

The petitioner also shows that moneys became due under the contract from the defendants (who reside in Pennsylvania), part of which was payable into this court by them, to be held to await the further order of the court, and that said Heckscher procured an attachment to be issued in that state, under which he had the said moneys so due attached, thereby preventing the payment of the moneys so due into this court under said order.

Lehigh Zinc and Iron Co. *v.* Trotter.

It is said that this is also in contempt of the order of this court, because the moneys due and payable into court are, because of such attachment, withheld, and that thereby the order of this court, at the instance of one of the defendants (a party to the suit), is frustrated.

Was it a contempt of the order of the court for the defendant to issue an attachment in a foreign jurisdiction, and, by virtue thereof, seize upon and withhold the moneys so ordered paid into this court? The credit, which it is alleged was attached, was due from one of the defendants, the Lehigh Zinc and Iron Company (Limited), of which company the said attaching creditor was a member, as well as a defendant individually. Therefore the credit which he attached was due from the company of which he was one, and to this extent he attached money in his own hands.

To repeat, can a sister state, by legal process, detain moneys which a court in this state has ordered and decreed shall be paid into the court making the order and decree? I think not. It seems to me that if such a doctrine were to prevail, great confusion and disaster would ensue.

The parties to this suit are all properly before the court. There is no question of jurisdiction either as to the person or subject-matter. This court acquired such jurisdiction long before the attachment was issued, and had pronounced its decree several months before any service of the writ.

Now, in reason, which court shall have the benefit of its judgment? Shall this court, which is prior in point of time? Is it just to say, "You have the decree, but we have the fund, and will set at naught your decree?" States do not condescend to tricks so groveling. Were they so to do, the word "comity" would soon become obsolete.

How forcible is this view, when applied to this case. Look at it a moment. The subject-matters of dispute are certain ores, and the manner of mining them, and the point of delivery, and the mode of sampling them, and the correctness of the assays of them. The mine from which the ores are dug and carried is in this state. All these questions and others are being litigated in

Lehigh Zinc and Iron Co. *v.* Trotter.

this state by the parties interested in a suit in which the above-named order has been made. The defendant, the Lehigh Zinc and Iron Company (Limited), is here, by its answer and cross-bill; by its cross-bill asking for relief, and by its petitions also asking for relief.

Now, suppose this defendant continues to refuse to obey the order of this court, and to withhold the moneys ordered to be paid to the clerk of this court, and to stand on the ground that they are within another jurisdiction and beyond the reach of the process of this court. It is needless to say that if the defendant assumes any such attitude, it at once loses all standing in this court and cannot be heard for any purpose.

The reason is that this court has acquired jurisdiction. This question is discussed in *Drake on Attachment* § *619,* and the sections following. He discusses the nature, extent and limitations of the rule. See, also, *Wallace* v. *McConnell, 13 Pet. 136.* In this case the court reasoned thus : " The next point presents the question as to the effect and operation of the proceedings under the attachment law of Alabama, as disclosed by the plea *puis darrien continuance.* The plea shows that the proceedings on the attachment were instituted after the commencement of this suit. The jurisdiction of the district court of the United States, and the right of the plaintiff to prosecute his suit in that court having attached, that right could not be arrested or taken away by any proceedings in any other court. This would produce a collision in the jurisdiction of courts that would extremely embarrass the administration of justice.

" If the attachment has been conducted to a conclusion, and the money recovered of the defendant before the commencement of the present suit, there can be no doubt that it might have been set up as a payment upon the note in question. And if the defendant would have been protected *pro tanto* under a recovery had by virtue of the attachment, and could have pleaded such recovery in bar, some principle would support a plea in abatement of an attachment proceeding prior to the commencement of the present suit. The attachment of the debt in such case in the hands of the defendant would fix it there in favor of the attach-

ing creditor, and the defendant could not afterwards pay it over to the plaintiff. The attaching creditor would, in such case, acquire a lien upon the debt, binding upon the defendant, and which the courts of all other governments, if they recognize such proceedings at all, would not fail to regard. If this doctrine be well founded, the priority of suit will determine the right. The rule must be reciprocal. And where the suit in one court is commenced prior to the institution of proceedings under attachment in another court, such proceedings cannot avert the suit, and the maxim, '*Qui prior est in tempore prior est in jure*,' must govern the case." See, also, *Campbell* v. *Emerson, 2 McLean 30*, and *Greenwood* v. *Rector, Hempst. 708; Cheongwo* v. *Jones, 3 Wash. C. C. 359*.

I think the principle thus announced should guide me as to the money heretofore ordered to be paid into this court.

It will be perceived that I express no opinion upon the right of action claimed by A. Heckscher against Charles W. Trotter for royalty on a mining lease. It has not been shown, nor can I perceive how questions of such importance can be raised in this suit by petition and disposed of without proof. Many of the allegations in the petition are denied in the answer, and the two together show matters in dispute between the parties quite outside of the question at issue. Under the present bill they may be made to bear upon the relief sought. This I am not prepared to controvert, but I am not prepared to say that they can be placed in that relation by petition. Then, from this position, naturally follows the inquiry as to the contempt. The conduct of Mr. Heckscher in ordering an attachment to be levied on the moneys due from himself and the company of which he was a member, and which had been ordered to be paid into this court, and which, by virtue of that levy, were detained and not paid into court, was an interference with the order of this court, and a hindrance to its execution. This admits of no dispute. Was such interference, by the forms of law, by Mr. Heckscher, in contempt of the order of this court? I think it was. I do not hesitate to say that I have sought for a reasonable path by which Mr. Heckscher could be carried out of this difficulty, but no one,

Lehigh Zinc and Iron Co. *v.* Trotter.

nor any glimpse of one, has appeared to my mind.  I took such earnest view of the case because Mr. Heckscher claims to be a *bona fide* creditor—everywhere and in all ages a favored class.

But the rights of creditors, and all others, must, under the circumstances of this case (the parties being before the court, and the subject-matter having been adjudicated upon, and the order being distinct and unqualified), be subordinated to the judgment and will of the court; that is, the execution of the judgment must not be interfered with without the will of the court being consulted, which will is always exercised according to the rights of the parties, and the equities of each case.  In this case just put (the serving the attachment upon the machinery &c.), the order of the court was not interfered with; for the attorney expressly instructed the officer not to remove or take possession of anything, while in the case last considered the order of the court was unmistakably frustrated and set at naught.  The value and force of the present insistment is strikingly illustrated by the caution of the attorney, as above shown.  It was the same plaintiff in this state as in the foreign.

In my judgment, the case is just as strong against Mr. Heckscher, whether he be only a member of the defendant company, or, as well, a defendant individually.  *Davis* v. *Mayor &c. of New York, 1 Duer 451, 9 N. Y. 263; People* v. *Compton, 1 Duer 512, 9 N. Y. 263; Sickles* v. *Borden, 4 Blatchf. 14–20.*

I need not characterize this contempt as a contemplated violation of the order, as culpable and high-handed.  Very eminent and really able counsel advised it—thought it no contempt.

If the defendant desires to be heard as to what the judgment of the court shall be for this contempt, he can be heard on Tuesday, the 31st day of March instant, at the hour of ten o'clock in the forenoon, at the state-house, in the city of Trenton, at which time and place I will advise an order that he do appear, that judgment may be pronounced against him.

While I am convinced that another matter which has been discussed is outside of the case by the pleadings, yet, after what has passed before me, I will venture to advise an order respecting it. I refer to the shipments of ore under the contract and the order

of the court. It appears that shipments have not been made since the month of December last, although the mine has practically been wrought to the capacity required by the agreement. I will advise that the complainant, through the manager, under the order of this court heretofore made, do forthwith ship the number of tons of ore required by the contract each and every month, and that he do also ship, in addition to such amounts so required by the contract, at least two hundred and fifty tons each and every month until the whole number of tons due under the contract for the months of January, February and March, A. D. 1885, shall have been shipped to the defendants; but no more than the said two hundred and fifty tons each month, unless the defendants shall give written notice to the manager that they require more, and then the amount so required shall be shipped, in all not to exceed five hundred tons in excess of the regular monthly shipments, as required by the contract.

I will advise a decree that all of the moneys due, or to become due, on said contract for ores delivered, or to be delivered, be paid into this court, and that the clerk of this court, upon the receipt of such moneys, forthwith, and without further order, pay to the complainant, or to his solicitor, the sum of $3,000, and that all the balance of said moneys be and remain in this court, subject to the further order of this court.

*Mr. Charles D. Thompson* and *Mr. George Northrop* (of Philadelphia), for appellants.

*Messrs. Cortlandt & R. Wayne Parker,* for respondent.

The opinion of the court was delivered by

REED, J.

The decree appealed from was made upon a petition filed in this cause. The facts involved in the suit which are important in respect to the question raised by the petition are substantially the following:

Trotter, the respondent, in 1881, entered into an agreement

with one Heckscher that he would deliver to Heckscher twelve thousand tons of franklinite ore in regular monthly shipments of one thousand tons each month, said shipments not to fall short of nine hundred and ninety tons, nor be in excess of one thousand and ten tons.

The agreement further provided that, after the expiration of the time mentioned for the delivery of the above twelve thousand tons, Heckscher, upon notice to Trotter, should have the right to the delivery to him of such quantities of ore as he indicated in his notice, under certain specified conditions.

On the 6th day of August, 1881, Heckscher assigned all his interest existing under this agreement to the appellants, the Lehigh Zinc and Iron Company.

On the 22d of May, 1882, the said company gave notice to Trotter that they would take twelve thousand tons of the said ore annually, in monthly shipments of not less than nine hundred and ninety tons nor more than one thousand and ten tons, until the year 1907, under the same terms, covenants and conditions as contained in the agreement of June 2d, 1881.

The agreement provided that the prices of the said ore should be graded according to the percentage of oxide of zinc it was found to contain by the test made by an assayer or assayers to be appointed by the parties.

A disagreement arose in 1882 in respect to the accuracy of the assays, and Trotter, alleging that money was due him which the company refused to pay, stopped the shipment of ore. He then filed a bill for the specific performance of the agreement, and the company filed a cross-bill for the same purpose and for the appointment of a receiver of the mine.

The court, in August, 1882, appointed a manager for the purpose of seeing that the ore was delivered and paid for according to the terms of the contract.

This was in accordance with the prayers of both parties.

The zinc company failed to pay for the ores shipped under the contract for the month of December, 1884, and on January 15th, 1885, the manager ordered shipments to stop, and they thereupon stopped.

The reason assigned by the zinc company, in their answer to the petition, for the cessation of payments, is based upon the following alleged existing facts:

That Trotter, when he entered into the agreement to deliver ore, was a lessee of the land from which the ore was to be taken. His lessor was James L. Curtis, who had the legal title to the premises.

Curtis conveyed his reversion to the Franklinite Steel and Zinc Company, and that company sold the same to Heckscher.

Under one of the two leases made to Trotter, rents and royalties were reserved, and Heckscher, as the assignee of the reversion, claimed these from Trotter.

Attachments were issued both in this state and in the state of Pennsylvania for their collection.

Under the last-mentioned writ, the moneys due from the Lehigh Zinc and Iron Company, in Pennsylvania, to Trotter, were attached. After the service of this writ of attachment, the Lehigh Zinc and Iron Company held back the December payment. This was followed, as we have observed, by a stoppage of the shipments of ore. Trotter then filed the present petition. In it was set forth the issuance of the writs of attachment and that the claim of Heckscher for royalties was unfounded; that the moneys due were required to operate the mine.

The petitioner prayed that Heckscher might be enjoined from prosecuting his writs of attachment; that he be decreed in contempt for the issuing of the same, and that the zinc and iron company might be decreed to have forfeited their right (which had been decreed to them in the suit) to detain in the court of chancery moneys due to the petitioner. The petitioner prayed to be advised whether, by reason of the foregoing acts of Heckscher and the company, he was not justified in abrogating the contract made for the delivery of and payment for the ore.

Upon the hearing upon the petition and answers, it was decreed that Heckscher was in contempt for issuing the attachment in Pennsylvania. It was further decreed that Trotter should ship to the Lehigh Zinc and Iron Company, each month, the number of tons called for in the contract, and also should deliver,

Lehigh Zinc and Iron Co. *v.* Trotter.

in addition thereto, at least two hundred and fifty tons of ore each month until the whole number of tons of ore due to the defendants for the months of January, February and March should have been shipped, but no more in any month unless defendants required it. It is from this part of the decree, namely, the order for the extra shipments of ore, that this appeal is taken by the Lehigh Zinc and Iron Company.

The action of the manager in stopping the shipments of quotas of ore for the months of January, February and March was induced by the failure of the defendants to pay for the previous December shipment. He acted upon the supposition that the failure of the company to pay for one or more justified him in refusing to deliver any subsequent quota until the previous dues were liquidated.

In this view he was supported by the court, which, by an intermediate order, approved his conduct in this respect. It was upon the assumption that the stoppage of the shipments was justified by the default of the defendants, and for the purpose of restoring to the petitioner what he had lost by the cessation of shipments for three months, that the part of the decree appealed from was made.

It seems plain, however, that under the contract, the failure of the defendants to pay for the December shipment did not justify a refusal to deliver the quotas due in each of the succeeding three months.

When this cause was before this court on a previous occasion it was held that a default in payment for one instalment of ore did not excuse the non-delivery of a subsequent portion, unless the conduct of the defaulting party was such as to evince an intention to abandon the contract. *Trotter* v. *Hecksher, 13 Stew. Eq. 612.*

No facts are apparent which indicate such an intention on the part of the defendants, but on the contrary, all the circumstances display the absence of such an intent.

But even if it be admitted that an unjustifiable refusal to pay for the December shipment afforded a legal ground for the refusal to make deliveries during the three subsequent months,

yet the facts appearing in the petition and the answer to the petition relieve the defendant from responsibility for the failure to make the payment.

The money due upon the December delivery was impounded in the hands of the defendants by legal process from the courts of Pennsylvania. Although the attachment under which this was done was sued out by Hecksher, and although he was held to be in contempt by the court of chancery for this conduct, yet no complicity between him and the defendants in carrying out this scheme is proven.

After the garnishment of the money due for the December delivery the defendants were powerless to do aught except to hold the money to answer the purposes of that proceeding, until the attachment was dissolved or otherwise terminated.

It seems clear, therefore, that the defendants were not responsible for the failure to pay for the December quota of ore, and also that the petitioner was inexcusable for not delivering the quotas for the months of January, February and March. The decree, therefore, compels a party not in the wrong and against his wish and presumably to his disadvantage, to accept ore at times and in quantities uncalled for in his contract, for the purpose of aiding the party who, without excuse, refused to deliver the ore according to his agreement.

In this view of the question involved, the decree seems to be erroneous.

Nor does this seem the less true because of the existence of the circumstance that by the assent of both parties the court of chancery had placed a manager in charge of the business, whose duty it was to make deliveries of ore and to collect pay for them, and it was the manager who stopped the deliveries during the three months.

It is obvious that the manager was not appointed to modify the terms of the contract between the parties, but for the purpose of executing that instrument. And the power of direction over his conduct which existed in the court of chancery, would be exercised in the light of the rights of the parties under the provisions of their agreement. It already appears that under

the contract, the circumstances which surround the present trans-action afford no ground for the present order.    And if the man-ager be regarded, in respect to his previous conduct, as the repre-sentative of both parties to the contract, then no act on his part can be the subject-matter of complaint by the petitioner, nor can the result of such be visited upon the defendants in the shape of this adverse decree.

In any aspect in which the cause can be viewed, I think that the decree is erroneous, and should be reversed.

*Decree unanimously reversed.*